IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA
Newport News Division

| | |
|---|---|
| LIBERTY COUNSEL, INC., | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )   Civil Action No. 4:17-CV-71 |
| | ) |
| GUIDESTAR USA, INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

## GUIDESTAR USA, INC.'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS THE COMPLAINT

Sona Rewari (VSB No. 47327)
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
(703) 714-7512
(703) 918-4018 (facsimile)
srewari@hunton.com

Gregory N. Stillman (VSB No. 14308)
Wendy C. McGraw (VSB No. 37880)
HUNTON & WILLIAMS LLP
500 East Main, Suite 1000
Norfolk, Virginia 23510
(757) 640-5300
(757) 625-7720 (facsimile)
gstillman@hunton.com
wmcgraw@hunton.com

*Counsel for Defendant*

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ...................................................................................................1

II.     FACTS ALLEGED IN THE COMPLAINT ..........................................................2

    A.      The Parties ..................................................................................................2

        1.      GuideStar ........................................................................................2

        2.      Liberty Counsel................................................................................3

    B.      The SPLC And Its Designations Of Domestic "Hate Groups"...............................4

    C.      GuideStar's Notation Of The SPLC's Hate Group Designation On Its
        Profiles Of 46 Nonprofit Organizations...................................................4

    D.      GuideStar's Stated Rationale For Adding The SPLC Notation............................5

III.    STANDARD OF REVIEW ....................................................................................8

       ARGUMENT ..........................................................................................................9

    A.      Liberty Counsel's Lanham Act Claim Fails As A Matter Of Law (Count I) .........9

        1.      GuideStar's SPLC Notation Was Not False Or Misleading ....................10

        2.      The SPLC Notation Was Not Made In Any "Commercial Advertising Or
            Promotion"..........................................................................................12

            a.      The  SPLC Notation Was Not "Commercial Speech"...................14

            b.      Liberty Counsel And GuideStar Are Not Commercial
                Competitors...............................................................................17

            c.      The SPLC Notation Was Not Made For The Purpose Of
                Influencing Consumers To Buy Any GuideStar Product
                Or Service ...................................................................................18

    B.      Liberty Counsel's Interference With Business Expectancy Claim Is
        Plagued With Fatal Defects (Count II) ...................................................18

    C.      Liberty Counsel Has Not Alleged A Plausible Defamation Claim,
        And It Cannot Do So (Count III) ...........................................................21

        1.      The SPLC Notation Is Not Actionable ........................................22

        2.      Liberty Counsel Has Not Alleged Any Facts Showing Actual Malice .....24

IV.     CONCLUSION.....................................................................................................26

# **TABLE OF AUTHORITIES**

**Page(s)**

## **Cases**

*Am. Commc'ns Network, Inc. v. Williams,*
    264 Va. 336, 568 S.E.2d 683 (2002).......................................................................................22

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009)..........................................................................................8, 9, 17

*Bell Atl. Corp. v. Twombly,*
    550 U.S. 544 (2007)...............................................................................................8

*Bolger v. Young Drug Products Corp.,*
    463 U.S. 60 (1983)...........................................................................................14, 15

*Brainware, Inc. v. Mahan,*
    808 F. Supp. 2d 820 (E.D. Va. 2011) ...................................................................19

*Chapin v. Knight-Ridder, Inc.,*
    993 F.2d 1087 (4th Cir. 1993) ..........................................................21, 22, 23, 24

*Commerce Funding Corp. v. Worldwide Sec. Servs. Corp.,*
    249 F.3d 204 (4th Cir. 2001) ...............................................................................18

*Comminelli v. The Rector & Visitors of the Univ. of Va.,*
    589 F. Supp. 2d 706 (W.D. Va. 2008), *aff'd* 362 F. App'x 359 (4th Cir. 2010) ....................20

*Design Res., Inc. v. Leather Indus. of Am.,*
    900 F. Supp. 2d 612 (M.D.N.C. 2012) .................................................................13

*Design Resources, Inc. v. Leather Indus. of Am.,*
    789 F.3d 495 (4th Cir. 2015) ................................................................................10

*Duggin v. Adams,*
    234 Va. 221, 360 S.E.2d 832 (1987).....................................................................18

*E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.,*
    637 F.3d 435 (4th Cir. 2011) .................................................................................9

*Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft,*
    189 F. Supp. 2d 385 (E.D. Va. 2002) ...................................................................19

*Foretich v. Capital Cities/ABC, Inc.,*
    37 F.3d 1541 (4th Cir. 1994) ................................................................................24

*Gazette, Inc. v. Harris*,
  229 Va. 1, 325 S.E.2d 313, *cert. denied*, 472 U.S. 1032 (1985)..............................................21

*Gertz v. Robert Welch, Inc.*,
  418 U.S. 323 (1974)..............................................................................................................24, 25

*Goodman v. Does 1-10*,
  No. 4:13-cv-131, 2014 WL 1310310 (M.D.N.C. Mar. 28, 2014)............................................16

*Gordon & Breach Science Publishers v. American Institute of Physics*,
  859 F. Supp. 1521 (S.D.N.Y. 1994)....................................................................................13, 17

*Gov't Employees Ins. Co. v. Google, Inc.*,
  330 F. Supp. 2d 700 (E.D. Va. 2004) ....................................................................................19

*Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor of Baltimore*,
  721 F.3d 264 (4th Cir. 2013) (en banc) ..................................................................................14

*GTSI Corp. v. Wildflower Int'l*,
  No. 1:09-cv-123, 2009 WL 2160451 (E.D. Va. Mar. 9, 2015)................................................19

*Harris v. Quinn*,
  ___ U.S. ___, 134 S.Ct. 2618 (2014).......................................................................................14

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
  491 U.S. 657 (1989)..................................................................................................................25

*Hatfill v. New York Times Co.*,
  532 F.3d 312 (4th Cir. 2008) ..............................................................................................24, 25

*Huntingdon Life Scis., Inc. v. Rokke*,
  978 F. Supp. 662 (E.D. Va. 1997) ......................................................................................13, 16

*Hyland v. Raytheon Tech. Servs.*,
  277 Va. 40, 670 S.E.2d 746 (2009)...........................................................................................23

*Jordan v. Kollman*,
  269 Va. 569, 612 S.E.2d 203 (2005)....................................................................................21, 22

*Lexmark In'l Inc. v. Static Control Components, Inc.*,
  ___ U.S. ___, 134 S.Ct. 1377 (2014)........................................................................................10

*Masco Contractor Servs. E., Inc. v. Beals*,
  279 F. Supp. 2d 699 (E.D. Va. 2003) .......................................................................................19

*Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co.*,
  493 S.E.2d 375 (1997) ..............................................................................................................18

-iii-

*Metro Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*,
    948 F. Supp. 2d 538 (D. Md. 2013) ................................................................. 13

*Milkovich v. Lorain Journal Co.*,
    497 U.S. 1 (1990) ............................................................................................. 23

*Mirafuentes v. Estevez*,
    No. 1:15-cv-10, 2015 WL 8177935 (E.D. Va. Nov. 30, 2015) ................. 19, 20, 23

*N.Y. Times Co. v. Sullivan*,
    376 U.S. 254 (1964) .......................................................................................... 24

*Nat'l Found. for Cancer Research v. Council of Better Business Bureaus, Inc.*,
    705 F.2d 98 (4th Cir.), *cert. denied*, 464 U.S. 830 (1983) ................................ 21

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com. Inc.*,
    591 F.3d 250 (4th Cir. 2009) ............................................................................. 9

*Neurotron, Inc. v. Am. Ass'n of Electrodiagnostic Med.*,
    189 F. Supp. 2d 271 (D. Md. 2001), *aff'd* 48 F. App'x 42 (4th Cir. 2002) ............. 13

*Pelligrini v. Northeastern Univ.*,
    No. 12-cv-40141, 2013 WL 5607019 (D. Mass. Aug. 23, 2013), *report &*
    *recommendation adopted by* 2013 WL 5755327 (D. Mass Sept. 25, 2013) ........... 16

*Phillips v. LCI Int'l, Inc.*,
    190 F.3d 609 (4th Cir. 1999) ............................................................................. 9

*Pizza Hut, Inc. v. Papa John's Int'l, Inc.*,
    227 F.3d 489 (5th Cir. 2000) ............................................................................ 10

*PMB Prods., LLC v. Mead Johnson & Co.*,
    639 F.3d 111 (4th Cir. 2011) ........................................................................... 10

*Radiance Found., Inc. v. N.A.A.C.P.*,
    786 F.3d 316 (4th Cir. 2015) ....................................................................... 14, 15

*Schaecher v. Bouffault*,
    290 Va. 83, 772 S.E.2d 589 (2015) ................................................................... 23

*Scotts Co. v. United Indus.*,
    315 F.3d 264 (4th Cir. 2002) ........................................................................... 10

*Sec'y of State for Defence v. Trimble Navigation Ltd.*,
    484 F.3d 700 (4th Cir. 2007) ............................................................................. 9

*Shenandoah Publ'g House, Inc. v. Gunter*,
    245 Va. 320, 427 S.E.2d 370 (1993) ................................................................. 25

*Snyder v. Phelps*,
   580 F.3d 206 (4th Cir. 2009) ...................................................................23

*Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*,
   299 F. Supp. 2d 565 (E.D. Va. 2004) ..............................................10, 13

*Tobinick v. Novella*,
   848 F.3d 935 (11th Cir. 2017) ...............................................................15

*United States v. United Foods, Inc.*,
   533 U.S. 405 (2001)..................................................................................14

*Yeagle v. Collegiate Times*,
   255 Va. 293, 497 S.E.2d 136 (1998)......................................................22

**Statutes**

15 U.S.C. § 1125(a)(1)(A) .............................................................................9

15 U.S.C. § 1125(a)(1)(B) ........................................................................9, 12

## I.      INTRODUCTION

GuideStar USA, Inc. ("GuideStar") is a nonprofit organization whose purpose is to encourage philanthropy by providing information about nonprofits that members of the public can use to make educated and informed decisions about their relationships with such nonprofits. Its website (www.guidestar.org) offers information on more than 1.6 million active nonprofits, drawn from a number of sources, both public and private, as well as information that some nonprofits have chosen to share about themselves.

Earlier this year, GuideStar began to include at the top of its "profile" pages for 46 nonprofits this note:   "This organization has been flagged as a hate group by the Southern Poverty Law Center" (the "SPLC")—which GuideStar described as a "respected hate group watchdog"—along with the SPLC's logo and a link to its website (the "SPLC Notation").   The change was met with both praise and criticism.   Last month, GuideStar announced that it was removing the SPLC Notation from the 46 nonprofits' profile pages "for the time being"—a decision that it attributed to its "commitment to objectivity" and its concern about the well-being of its personnel who had begun receiving "harassment and threats."

Liberty Counsel, a nonprofit that advocates on matters of "religious liberty, the sanctity of life, human sexuality, marriage, and family values," strenuously objects to its designation by the SPLC as a "hate group."   It alleges that the SPLC applies this label to groups based on their ideologies, rather than criminality and violence.   Even were that so, Liberty Counsel has not alleged, and cannot allege,  that "hate group" has a settled meaning that *requires* criminality and violence.   Liberty Counsel's ire at the SPLC—whether deserved or not—is plainly misdirected toward GuideStar, whom it accuses of having made a "politically-motivated" decision to add the SPLC Notation to its profile of Liberty Counsel.   In a poorly-conceived and thinly-disguised

1

effort to muzzle speech on matters of public concern, Liberty Counsel charges GuideStar with violation of the Lanham Act, and interference with business expectancy and defamation claims under Virginia law.  Because each of these claims incurably fails as a matter of law, the Complaint should be dismissed with prejudice.

## II.      FACTS ALLEGED IN THE COMPLAINT

The Complaint makes the following factual allegations relevant to this Motion:

### A.      The Parties

#### 1.      GuideStar

GuideStar is a Delaware nonprofit corporation with its principal place of business in Williamsburg, Virginia.  Dkt. #1, Compl. ¶ 7.  Its "mission" is to "revolutionize philanthropy by providing information that advances transparency, enables users to make better decisions, and encourages charitable giving." *Id.* ¶ 34 (internal quotation omitted).  According to GuideStar, it "gathers and disseminates information about every single IRS registered nonprofit organization" and "aims to provide as much information as [it] can about each nonprofit's mission, legitimacy, impact, reputation, finances, programs, transparency, governance, and so much more." *Id.* ¶ 35 (internal quotation omitted) (alteration in original).  It is a "public charity that collects, organizes, and presents the information you want in an easy-to-understand format," and "claims to do so while remaining neutral." *Id.* ¶ 36 (internal quotation omitted).

In 1996, GuideStar began publishing a "Directory of American Charities," and it has since continued to increase the number of charities profiled on its website. *Id.* ¶¶ 30, 31.  By GuideStar's count, it currently maintains individual profiles with information about 1,684,038 active nonprofit organizations. *Id.* ¶ 39 & Ex. A.

According to GuideStar's blog, "it has more than 3 billion pieces of data, much of it [obtained] from the Forms 990 that nonprofits file with the IRS."  Compl., Ex. A, at 1.  Its

"profiles" of many nonprofit organizations also include additional information, including "data shared directly with GuideStar by 138,000 nonprofits, more than 300,000 reviews, [and] analysis from 3,000 experts." *Id.* Its website provides "tools to let nonprofits tell their own stories—in their own terms—with text, photos, video, and quantitative metrics." *Id.* at 2. Through a "partnership with GreatNonprofits," GuideStar's website also shares both "positive" and "negative" reviews of nonprofits from those organizations' "stakeholders." *Id.*

GuideStar's directory and the information published on its website are used by state and national government bodies to make "various decisions related to nonprofit organizations," and by donors "to make decisions about donations, grants, and funding requests." Compl. ¶¶ 32, 33.

### 2.    Liberty Counsel

Liberty Counsel describes itself as a Florida-based nonprofit "education, advocacy, and legal defense organization dedicated to advancing religious freedom, the sanctity of human life, and the preservation of family values from a Christian and Biblical perspective." Compl., ¶¶ 6, 15. It is "known nationally and internationally for its litigation, education and public policy activities." *Id.* ¶ 17. Liberty Counsel attorneys "are involved in numerous media interviews each year resulting in thousands of printed articles and media broadcasts, and have appeared on countless radio and television network and cable programs." *Id.* ¶ 20.

Liberty Counsel alleges that it "relies on its good reputation to attract and receive charitable donations from individuals, groups, churches, organizations, foundations, and others." *Id.* ¶ 26. It claims that these "charitable donations are the lifeblood of Liberty Counsel's public support," and it "would not be able to exist or serve its clients, constituents, or the public without such support." *Id.*

**B.**     **The SPLC And Its Designations Of Domestic "Hate Groups"**

The SPLC holds itself out as the "premier U.S. non-profit organization monitoring the activities of domestic hate groups and other extremists, including the Ku Klux Klan, the neo-Nazi movement, neo-Confederates, racist skinheads, black separatists, antigovernment militias, Christian identity adherents, and others." *Id.* ¶ 56 (internal quotation omitted).

Liberty Counsel alleges that the SPLC's list of hate groups also "lumps together" with these groups "a large number of Christian organizations who advocate for Biblical and Christian principles in a lawful and peaceful manner, including Liberty Counsel…." *Id.* ¶ 57.   It also alleges that the SPLC has stated "very explicitly" that its "hate group" label has "nothing to do with criminality or violence of any kind" but rather is based "strictly" on the group's "ideology," and that the SPLC views itself in a "political struggle" with these groups and aims to "destroy them … as a political matter." *Id.* ¶¶ 58-60, 61 (internal quotation omitted) (alteration in original).   According to a Senior Fellow at the SPLC, the way that the SPLC has learned to "destroy" these groups is to "use facts." *Id.* ¶ 63 (internal quotation omitted).

**C.**     **GuideStar's Notation Of The SPLC's Hate Group Designation On Its Profiles Of 46 Nonprofit Organizations**

In 2017, GuideStar modified its profiles of 46 (out of 1.6 million-plus) nonprofit organizations to include a note at the top of each profile page stating: "This organization was flagged as a hate group by the Southern Poverty Law Center." *Id.* ¶ 98 & Exhibit B, at 1.   This notation (the "SPLC Notation") was displayed at the top of GuideStar's profile page for Liberty Counsel, along with the SPLC's logo and a link to its website. *Id.*   The SPLC Notation included a "tool tip," which was indicated by an "i" in a circle placed next to the SPLC Notation. *See* Compl., Ex. B.   In the tool tip, GuideStar stated:

> The Southern Poverty Law Center (SPLC) is a respected hate group watchdog.   There is disagreement on some of the SPLC's

> specific choices, but on balance GuideStar believes the analysis is strong enough to share.  We leave it to you to come to your own conclusions.

*See* Exhibit 1 (hyperlink omitted).[1]  GuideStar's profile page regarding Liberty Counsel also included links to its IRS filings, addresses of Liberty Counsel's websites, as well as text regarding Liberty Counsel's "programs and results."  *See* Compl., Ex. B.  The SPLC Notation is the only statement on Liberty Counsel's profile page about which it complains in this suit.

According to Liberty Counsel, GuideStar's intention in adding the SPLC Notation was "political" and motivated by "its shared ideology with the SPLC."  *Id.* ¶¶ 107, 110, 113.  It claims that GuideStar's President and CEO, Jacob Harold[2] has a "liberal political ideology" and "considers himself a 'social-change strategist.'"  *Id.* ¶¶ 114, 118.  Citing his professional work history, financial contributions, and even photographs of Mr. Harold taken from the Internet, Liberty Counsel describes Mr. Harold as a "supporter" of "liberal political causes," including "climate change," "abortion," and "LGBT rights."  *Id.* ¶¶ 114-116.  Liberty Counsel accuses Mr. Harold of having "brought his personal political agenda into GuideStar," and pronounces that "now GuideStar has become a politically-motivated organization."  *Id.* ¶ 119.

## D.   GuideStar's Stated Rationale For Adding The SPLC Notation

In an Associated Press article published on www.cbsnews.com on June 8, 2017, Mr. Harold characterized GuideStar's decision to include the SPLC Notation as a "response to the recent rise in 'hateful rhetoric' in the U.S."  *Id.* ¶ 50 (citing *GuideStar, a website about charities,*

---

[1] Because Liberty Counsel's profile page form the basis of its lawsuit, the Court may properly consider the entirety of the page, even though Liberty Counsel did not attach this portion to its Complaint.

[2] The Complaint makes allegations about both "Mr. Harold" and "Mr. Herald."  Compl. ¶¶ 114-20.   Based on the context of the references to "Mr. Herald," GuideStar presumes that Liberty Counsel intended all of these to refer to the same person, Jacob Harold.

*flags dozens of nonprofits as hate groups*, CBS NEWS (Jun. 8, 2017) (attached as Exhibit 2).[3]

According to the article, Mr. Harold stated that "'it's highly politicized in a highly politicized

moment in history.'"  Exhibit 2; Compl. ¶ 51.    The article also reported Mr. Harold as stating

that GuideStar made "a judgment to trust" the SPLC, and "did not conduct its own analysis of

whether a nonprofit deserves to be labeled a hate group."  Exhibit 2; Compl ¶¶ 51, 52.

Mr. Harold also elaborated on GuideStar's rationale in a blog posting on its website,

dated June 15, 2017, that stated in relevant part:

> GuideStar's database has information on 1,684,038 active
> nonprofits.  Recently we added new information to the profiles of
> 46 of these organizations:  the fact that they had been designated as
> hate groups by the Southern Poverty Law Center (SPLC).  That
> action has earned us both celebration and criticism.  So I wanted to
> take a moment to share the thinking behind our choice to add this
> new data source.
>
> We see our role in the nonprofit sector as being a hub of
> information about nonprofit organizations.  GuideStar has more
> than 3 billion pieces of data, much of it from the Forms 990 that
> nonprofits file with the IRS.  Many profiles also include additional
> information:  data shared directly with GuideStar by 138,000
> nonprofits, more than 300,000 reviews, analysis from 3,000
> experts and more.
>
> Our task is to take this diversity of sources to offer a multi-
> dimensional view of nonprofits.  *That means GuideStar profiles
> present a mixture of irrefutable facts and people's opinions.*
> Sometimes, a single profile contains contradictory
> information….We also have built tools to let nonprofits tell their
> own stories—in their own terms—with text, photos, video, and
> quantitative metrics.  *None of these data sources is perfect.  Even
> the seemingly objective financial data in the Form 990 is subject to
> significant accounting discretion.*
>
> *GuideStar's job is not to make decisions for people.  Our job is to
> help people access the information they need so that they can make
> their own decisions.*

---

[3] Available at:  http://www.cbsnews.com/news/guidestar-charity-website-flags-
nonprofits-hate-groups/ (last visited July 24, 2017).

> A few months ago we started to hear from customers who were worried they might facilitate a donation to a hate group—*which I'll (imperfectly) define as an organization that denigrates a group of people based on their identity.*  Given this concern, we began researching potential partners from whom we could obtain data on hate groups—*not because we thought we could provide a definitive answer, but because we wanted to offer additional data*.  The Southern Poverty Law Center (SPLC) emerged as the best option.  GuideStar is not the only organization to rely on the SPLC:  major donor-advised funds, giving platforms, media outlets, and law enforcement agencies also use SPLC's data.

> *The SPLC has the most comprehensive information on hate groups that we could find.*  It has been in business for 46 years and shows every sign of remaining in existence for many years to come.  *There are, though, legitimate critiques of SPLC's analyses*, such as this from the Philanthropy Roundtable or this in the *Atlantic*.  And although the SPLC identifies a wide range of hate group ideologies—from "Black Separatist" to "Holocaust Denial"—some have accused SPLC of political bias.  Others accuse it of being too focused on fundraising.  *We fully acknowledge these critiques.  No data source is perfect.*

> …

> *If a user does not consider the SPLC's analysis to be legitimate, we invite him or her to ignore it.  We would say the same for any other type of data we share….*

*Id.*, Exhibit A (emphases added) (hyperlinks omitted).

On June 23, 2017, GuideStar announced in a news release posted on its website that it was removing the SPLC Notation from the profiles of the 46 organizations "for the time being."  *Id.* ¶ 102 & Exhibit D.  It stated, among other things, that "a significant amount of the feedback we've received in recent days has shifted from constructive criticism to harassment and threats against our staff and leadership."  *Id.*, Exhibit D.  It explained that its decision to remove the SPLC Notation was "driven by our commitment to objectivity and our concerns for our staff's

wellbeing," and that it would continue to "make this information available to any user on request." *Id.*

On June 28, 2017, Liberty Counsel filed this lawsuit against GuideStar, alleging violation of § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), as well as interference with business expectancy and defamation under Virginia common law. Compl., ¶¶ 139-184. It alleges that it has suffered, is suffering, and will continue to suffer actual damage to its reputation, good name, and standing with its donors, potential donors, and future potential donors. *Id.* ¶¶ 130-33. It also alleges that "[d]onations to Liberty Counsel have and will be negatively affected by GuideStar's false, misleading, and deceitful designation of Liberty Counsel as a 'hate group….'" and that its "mission of providing pro bono legal representation to many individuals, churches, nonprofit and for profit corporations, and government agencies and political subdivisions has and will be directly harmed and hindered." *Id.* ¶¶ 137-38.

As explained below, each of these claims fails as a matter of law.

### III.   STANDARD OF REVIEW

To survive a motion under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). The legal framework of a claim must be supported by factual allegations that "raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. While the Court accepts as true at this stage any "well-pleaded factual allegations," it is not bound to credit "a legal conclusion couched as a factual allegation." *Id.* at 678-79.

The Court on such a motion should conduct a "context-specific" analysis, drawing on "its judicial experience and common sense," and determine whether the factual allegations "plausibly suggest an entitlement to relief." *Id.* at 679, 681. The plausibility standard demands more than a showing of "a sheer possibility that a defendant has acted unlawfully." *Id.* at 678. Instead, the facts as pled must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "In other words, the complaint's factual allegations must produce an inference of liability strong enough to nudge the plaintiffs' claims 'across the line from conceivable to plausible.'" *Nemet Chevrolet, Ltd. v. Consumeraffairs.com. Inc.*, 591 F.3d 250, 256 (4th Cir. 2009) (internal citations omitted).

In considering a motion to dismiss, the Court "evaluates the complaint in its entirety, as well as documents attached or incorporated into the complaint." *E.I. du Pont de Nemours & Co. v. Kolon Indus., Inc.*, 637 F.3d 435, 448 (4th Cir. 2011) (citing *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 705 (4th Cir. 2007)). It properly "may consider official public records, documents central to a plaintiff's claim, and documents sufficiently referred to in the complaint, so long as the authenticity of these documents is not disputed." *Phillips v. LCI Int'l, Inc.*, 190 F.3d 609, 618 (4th Cir. 1999) (permitting consideration of extraneous material if such materials are "integral to and explicitly relied on in the complaint").

## ARGUMENT

### A.    Liberty Counsel's Lanham Act Claim Fails As A Matter Of Law (Count I).

The Court should dismiss Count I because Liberty Counsel has not alleged, and cannot allege, a plausible claim under § 43(a) of the Lanham Act. A false advertising claim under § 43(a),[4]  15 U.S.C. § 1125(a)(1)(B), requires as a threshold matter, that the defendant have

---

[4] Section 43(a) provides "two distinct bases of liability," false association, also known as false designation, 15 U.S.C. § 1125(a)(1)(A), and false advertising, 15 U.S.C. § 1125(a)(1)(B).

"made a false or misleading description of fact or representation of fact in a commercial advertisement about his own or another's product." *Design Resources, Inc. v. Leather Indus. of Am.*, 789 F.3d 495, 501 (4th Cir. 2015); *PMB Prods., LLC v. Mead Johnson & Co.*, 639 F.3d 111, 120 (4th Cir. 2011) (quoting *Scotts Co. v. United Indus.*, 315 F.3d 264, 272 (4th Cir. 2002)).

By Liberty Counsel's own allegations, however, GuideStar's inclusion of the SPLC Notation was not a "false or misleading description of fact or representation of fact." Nor was it "made in a commercial advertisement."

### 1.    GuideStar's SPLC Notation Was Not False Or Misleading.

To be actionable as false advertising, the contested statement must be both (1) a representation of fact, and (2) false or misleading. *See Design Resources*, 789 F.3d at 501. Statements of opinion are not actionable under § 43(a). *Id.* at 502. To be a representation of fact, the statement must be a "specific and measurable claim, capable of being proved false or of being reasonably interpreted as a statement of objective fact." *Id.* at 502 (internal quotation omitted). The statement "must 'admit[] of being adjudged true or false in a way that … admits of empirical verification.'" *Id.* (quoting *Pizza Hut, Inc. v. Papa John's Int'l, Inc.*, 227 F.3d 489, 496 (5th Cir. 2000)) (alterations in original). Whether a statement is a representation of fact or a non-actionable opinion is a question of law to be decided by the Court. *Id.*

Here, the SPLC Notation makes a single representation of fact: that Liberty Counsel "was flagged as a hate group by the Southern Poverty Law Center." Compl. ¶ 98 & Ex. B at 1. But this factual representation was, by Liberty Counsel's own allegations, literally true: as the

---

*Lexmark In'l Inc. v. Static Control Components, Inc.*, __ U.S. ___, 134 S.Ct. 1377, 1384 (2014). Liberty Counsel, however, has not alleged any facts relevant to a false designation claim, which arises when a defendant makes a false designation that is likely to deceive or cause confusion as to the origin of the defendant's goods or services. *See, e.g., Tao of Sys. Integration, Inc. v. Analytical Servs. & Materials, Inc.*, 299 F. Supp. 2d 565, 572 (E.D. Va. 2004) (Smith, J.).

Complaint repeatedly states, the SPLC *has* designated Liberty Counsel a "hate group." *See* Compl. ¶¶ 1, 2, 57, 98.

Liberty Counsel also calls the SPLC Notation "misleading," under the theory that "GuideStar is making a factual representation that Liberty Counsel *is* a hate group." Compl. ¶ 99 (emphasis added). But even if the SPLC Notation could reasonably be read that way (which it cannot), it would still not be actionable under the Lanham Act.

Liberty Counsel has not alleged, nor could it allege, that the term "hate group" has a fixed meaning. The word "hate" describes subjective feelings and emotions. The word also admits a broad range of uses and meanings. *See, e.g., Hate, v.*, OXFORD'S ENGLISH DICTIONARY (3d ed. 2017) (attached as Exhibit 3); *Hate, n.*, OXFORD'S ENGLISH DICTIONARY (3d ed. 2017) (attached as Exhibit 4).

As Liberty Counsel alleges, the SPLC and GuideStar have made no secret about how they are using the term "hate group"—to describe "an organization that denigrates a group of people based on their identity." Compl. ¶¶ 43, 112. The SPLC's "Hate Map" webpage, to which the Court is directed in paragraph 57 of the Complaint, also states how SPLC is using the term: "All hate groups have practices or beliefs that attack or malign an entire class of people, typically based on their immutable characteristics."[5] Significantly, Liberty Counsel does not allege any facts to show that it does not fit SPLC's "hate group" label under this definition of the term.

Instead, Liberty Counsel insists that the term "hate group" should be reserved for groups that incite criminality and violence, that "lump[ing]" it under the same label used for the Ku Klux Klan and neo-Nazis is "reckless[]." Compl. ¶¶ 56-58. Significantly, however, Liberty Counsel does not—and cannot allege—any facts to demonstrate that the term "hate group" has a

_____

[5] SPLC, Hate Map, https://www.splcenter.org/hate-map) (last visited July 24, 2017).

fixed definition that *requires* criminality and violence. The dictionary definition of "hate" certainly does not. And none of the articles and commentary by the SPLC's critics which Liberty Counsel cites in its Complaint suggest that "hate group" is a term that has any fixed criteria, much less that those criteria require that the group have committed criminal or violent acts. One says just the opposite. *See* Charlotte Allen*, King of Fearmongers: Morris Dees and the Southern Poverty Law Center, scaring donors since 1971*, WEEKLY STANDARD *(*Apr. 15, 2013) ("hate groups commit almost no violence") (cited at Complaint ¶ 59) (attached as Exhibit 5).[6] Another points out that "there are no significant academic centers that regularly publish objective and rigorous data on non-Islamic domestic extremism," and that "the SPLC remains the go-to media source for data on domestic extremists of the non-Muslim variety." J.M. Berger, *The Hate List: Is America really being overrun by right-wing militias*, FOREIGN POLICY (Mar. 12, 2013) (cited at Compl. ¶¶ 77-78) ("Berger Article") (attached as Exhibit 6).[7]

At bottom, GuideStar's SPLC Notation that Liberty Counsel "was flagged as a hate group by the Southern Poverty Law Center" is a literally true statement that cannot plausibly be proved to be a false statement of fact. Liberty Counsel's Lanham Act claim thus fails as a matter of law, and it should be dismissed with prejudice.

**2. The SPLC Notation Was Not Made In Any "Commercial Advertising Or Promotion."**

Liberty Counsel's Lanham Act claim fails for a second, independent reason: GuideStar's SPLC Notation was not made in any commercial advertising or promotion.

The Lanham Act's false advertising provision, by its plain terms, applies only to "commercial advertising or promotion." 15 U.S.C. § 1125(a)(1)(B). This is consistent with its

---

[6]Available at http://www.weeklystandard.com/king-of-fearmongers/article/714573) (last visited July 24, 2017).

[7]Available at http://foreignpolicy.com/2013/03/12/the-hate-list/ (last visited July 24, 2017).

legislative history which makes clear that the statute's false advertising provision was not intended to cover speech—even false speech—made in any other context:

> Under this proposed change *only* false or misleading "advertising or promotion" would be actionable, whether it pertained to the advertiser itself or another party. The change would exclude all other misrepresentations from section 43(a) coverage. These others are the type which raise free speech concerns, such as a Consumer Report which reviews and may disparage the quality of … products, [and] misrepresentations made by interested groups which may arguably disparage a company and its products …. All of these would be judged by first amendment law … and not section 43(a) law….

> [T]he proposed change in section 43(a) should not be read in any way to limit political speech, consumer or editorial comment, parodies, satires, or other constitutionally protected material…. The section is narrowly drafted to encompass only clearly false and misleading commercial speech.

135 Cong. Rec. H1216-17 (daily ed. April 13, 1989) (statement of Rep. Kastenmeier) (emphasis in original) (attached as Exhibit 7).

While the Fourth Circuit has not expressly adopted a standard to define "commercial advertising or promotion," many courts in this Circuit, including this one, have relied upon the four-part test set forth in *Gordon & Breach Science Publishers v. American Institute of Physics*, 859 F. Supp. 1521 (S.D.N.Y. 1994).[8] Under this widely-accepted test, a representation is made in "commercial advertising or promotion" if it is: (1) commercial speech; (2) by a defendant who is in commercial competition with the plaintiff; (3) made for the purpose of influencing consumers to buy the defendant's goods or services; and (4) disseminated sufficiently to the

---

[8] *See, e.g, Metro Reg'l Info. Sys., Inc. v. Am. Home Realty Network, Inc.*, 948 F. Supp. 2d 538, 552-53 (D. Md. 2013); *Design Res., Inc. v. Leather Indus. of Am.*, 900 F. Supp. 2d 612, 616 (M.D.N.C. 2012); *Tao of Sys. Integration*, 299 F. Supp. 2d at 572; *Neurotron, Inc. v. Am. Ass'n of Electrodiagnostic Med.*, 189 F. Supp. 2d 271, 275 (D. Md. 2001), *aff'd* 48 F. App'x 42 (4th Cir. 2002); *Huntingdon Life Scis., Inc. v. Rokke*, 978 F. Supp. 662, 666 (E.D. Va. 1997) (Morgan, J.).

relevant purchasing public to constitute "advertising" or "promotion" within that industry. *Id.* at 1535-36.

Applied against the factual allegations of the Complaint, these factors lead to a unitary conclusion:  The SPLC Notation was not made in any commercial advertising or promotion.[9]

### a.     The  SPLC Notation Was Not "Commercial Speech."

Commercial speech is "'speech that does no more than propose a commercial transaction.'" *Harris v. Quinn*, ___ U.S. ___, 134 S.Ct. 2618, 2639 (2014) (quoting *United States v. United Foods, Inc.*, 533 U.S. 405, 409 (2001)); *see also Greater Baltimore Ctr. for Pregnancy Concerns, Inc. v. Mayor of Baltimore*, 721 F.3d 264, 284 (4th Cir. 2013) (en banc).   In determining whether speech is commercial, the Fourth Circuit considers four factors, derived from *Bolger v. Young Drug Products Corp.*, 463 U.S. 60, 66 (1983):  "(1) whether the speech is an advertisement; (2) whether [the] speech refers to specific products or services; (3) whether the speaker has an economic motivation for the speech; and (4) "the viewpoint of the listener," i.e., whether the listener would perceive the speech as proposing a transaction. *Radiance Found., Inc. v. N.A.A.C.P.*, 786 F.3d 316, 331-32 (4th Cir. 2015) (citing *Greater Baltimore*, 721 F.3d at 285-86).   These factors are "cumulative," so it is not necessary that all these characteristics be present.  *Id.* (citing *Greater Balt.*, 721 F.3d at 285-86).

Conversely, the absence of these characteristics can allow a court to determine, as a matter of law, that challenged speech is noncommercial.  In *Radiance*, for example, the Fourth Circuit applied the *Bolger* factors to hold that a nonprofit organization's publication on its website of an article that criticized another nonprofit for its stance on abortion, was not commercial speech as a matter of law.  *Id.* at 332.  It reasoned that the article:

---

[9] The only factor that Liberty Counsel can plausibly meet is the last one—sufficient dissemination to the purchasing public—because the SPLC Notation was posted on GuideStar's publicly-available website.

- "was not an advertisement;"

- did not "offer the reader anything for sale" and indeed, "did not even mention Radiance's [the author organization] services;" and

- from the "the viewpoint of a reasonable reader," which was "the key" factor there, "[a] person navigating to the article, even if through a Google search for 'NAACP,' is highly unlikely to read the article as advertising a Radiance service or proposing a transaction of any kind."

*Id.* at 332.  Although the district court had relied upon the fact that the websites "offered various opportunities for visitors ... to donate to Radiance, pay to sponsor billboards, secure licensed content, or erect state-specific webpages for a fee," the Fourth Circuit held that "[t]he fact that the websites provided opportunities to engage in financial transactions does not demonstrate that the article itself was commercial."  *Id.*  While the Lanham Act claims in *Radiance* were not false advertising but rather, trademark infringement and dilution, the Fourth Circuit's application of the *Bolger* factors is equally apt to a false advertising claim.

The Eleventh Circuit's recent decision in *Tobinick v. Novella*, 848 F.3d 935 (11th Cir. 2017), for instance, applied the *Bolger* factors to false advertising claims that were based on two articles written by a physician on a nonprofit organization's blog which disparaged the "novel treatments" developed by another physician.  *Id.* at 940.   Neither article proposed any commercial transaction.  *Id.* at 950.  The claimed purpose of the blog on which they were published was educational—"to provide an objective analysis of questionable or controversial medical claims so that consumers can make more informed decisions."  *Id.* (internal quotation omitted).  The content of the articles "corroborate[d] this stated educational purpose" because they discussed the plausibility of the plaintiff-physician's medical treatments and the shortage of medical studies supporting the plaintiff's medical claims.  *Id.*  The articles thus "add[ed] to the public debate regarding the viability of a non-FDA approved medical treatment and [we]re

-15-

clearly of import to the public." *Id.* The court found that the articles were not commercial speech, and they were not actionable under the Lanham Act. *Id.* at 951-52.

Twenty years ago, Judge Morgan ruled that statements made by People for the Ethical Treatment of Animals in press releases, interviews, and a "heavily edited videotape" about a plaintiff's animal testing facility were not commercial speech. *Rokke*, 978 F. Supp. at 666-67. Other courts have similarly found that statements that sought to inform, educate, advocate, or merely air personal grievances, without any indication that the defendant was proposing a commercial transaction or concerned only about its economic interests, are not commercial speech regulated by the Lanham Act. *See, e.g., Goodman v. Does 1-10*, No. 4:13-cv-131, 2014 WL 1310310, at *6 (M.D.N.C. Mar. 28, 2014) (articles and comments on anonymous blog accusing plaintiff of alleged deceptive business practices and criminal activities); *Pelligrini v. Northeastern Univ.*, No. 12-cv-40141, 2013 WL 5607019, at *6 (D. Mass. Aug. 23, 2013) (scientific paper posted on university's publicly-available website), *report & recommendation adopted by* 2013 WL 5755327 (D. Mass Sept. 25, 2013); *Neutron,* 189 F. Supp. at 276-77 (article evaluating medical device published by nonprofit organization of medical professionals).

The SPLC Notation at issue here also was not commercial speech. The SPLC, on its face, does not propose any commercial transaction. GuideStar's mission and the claimed purpose of its website is informative. The claimed purpose of its profile pages for each nonprofit, including Liberty Counsel, is also informative. GuideStar explained the SPLC Notation—which was added to Liberty Counsel's profile page—as also being informative. *See* Compl., Ex. A. Moreover, GuideStar acknowledged that there was "some disagreement on some of the SPLC's specific choices," stated its belief that "on balance" the information was "strong enough to share," and invited readers "to come to [their] own conclusions," even providing a link

to the SPLC's website.  *See* Complaint, Ex. B (Liberty Counsel's profile page); Exhibit 1 hereto

(tool tip displayed on profile page).  Liberty Counsel has alleged no facts to show that GuideStar

had a financial or economic motivation.[10]  Just the opposite, Liberty Counsel attributes the SPLC

Notation to GuideStar's "political" views and "ideology."  *See, e.g.,* ¶¶ 107, 110.  It also alleges

that GuideStar has become a "politically-motivated organization" that "adopted the SPLC's

designation of Liberty Counsel as a 'hate group' based purely on its ideological opposition to

Liberty Counsel."  *Id.* ¶¶ 119, 121.  These allegations admit that the SPLC Notation is not

commercial speech, and thus, it is not actionable as false advertising.

### b. Liberty Counsel And GuideStar Are Not Commercial Competitors.

Liberty Counsel also has not alleged any facts demonstrating that GuideStar and Liberty

Counsel are commercial competitors—the second *Gordon & Breach* factor.  Though it makes the

conclusory allegation that "GuideStar's relationship with nonprofit organizations, including

Liberty Counsel is commercially competitive," Compl. ¶ 144, that naked conclusion is

unsupported by any factual allegations.  *See Iqbal*, 556 U.S. at 678 ("A claim has facial

plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable

inference that the Defendant is liable for the misconduct alleged.").  The mere fact that both

GuideStar and Liberty Counsel are nonprofit corporations is insufficient to demonstrate a

commercially competitive relationship.  This factor, therefore, also shows that the SPLC

Notation was not made in commercial advertising or promotion.

---

[10] Liberty Counsel's only allusion to any economic interests are those of the users of the GuideStar website who expressed their worry that they may facilitate a donation to a hate group. *See* Compl. ¶ 43.  While the SPLC Notation may serve the economic interests of *consumers* who use the GuideStar website to make financial decisions, that does not demonstrate any plausible benefit to *GuideStar's* economic interests from the SPLC Notation, which is the operative measure.

### c.  The SPLC Notation Was Not Made For The Purpose Of Influencing Consumers To Buy Any GuideStar Product Or Service.

On the third *Gordon & Breach* factor—whether the representation was made for the purpose of influencing consumers to buy the defendant's goods or services—Liberty Counsel has again pled itself out of court.  The Complaint alleges that GuideStar was trying to "influence the consumers of its information in the decisions they make *concerning donations to various nonprofit organizations*." Compl. ¶ 44 (emphasis added).  Even by Liberty Counsel's account, GuideStar's purpose was not to influence consumers to buy *GuideStar's* goods or services.  This concession, coupled with the Complaint's repeated allegations that the SPLC Notation was a "political" decision by GuideStar, confirms that the SPLC Notation was not made in any commercial advertising or promotion.

Because the SPLC Notation was not made in any commercial advertising or promotion, Liberty Counsel has not alleged, and cannot allege, a plausible Lanham Act claim.  Count I, therefore, also should be dismissed with prejudice, for this second, independent reason.

### B.  Liberty Counsel's Interference With Business Expectancy Claim Is Plagued With Fatal Defects (Count II).

Liberty Counsel's "Interference With Business Expectancy Claim" under Virginia common law similarly fails as a matter of law for multiple reasons.  To state a claim for interference with an expectancy, a plaintiff must allege facts showing the following: (1) the existence of a valid expectancy; (2) knowledge of the expectancy on the part of the interferor; (3) intentional interference inducing or causing termination of the expectancy; (4) use of improper methods to interfere with the expectancy; and (5) resultant damage to the plaintiff.  *Commerce Funding Corp. v. Worldwide Sec. Servs. Corp.*, 249 F.3d 204, 213 (4th Cir. 2001); *Maximus, Inc. v. Lockheed Info. Mgmt. Sys. Co.*, 493 S.E.2d 375, 378 (1997); *Duggin v. Adams*, 234 Va. 221, 226-27, 360 S.E.2d 832, 836 (1987).

-18-

"The purpose of laws against tortious interference is not to protect consumers or the operation of the marketplace generally. Rather, these causes of action provide a legal remedy where a particular party's *specific, existing* contract or business expectancy or opportunity has been interfered with in a tortious manner."  *Masco Contractor Servs. E., Inc. v. Beals*, 279 F. Supp. 2d 699, 709 (E.D. Va. 2003) (Smith, J.) (emphasis in original).  A plaintiff must, therefore, allege a "*specific,* existing contract or business expectancy" with which the defendant has allegedly interfered to survive a motion to dismiss.  *Id.* at 709-10 (emphasis in original).

Here, Liberty Counsel's Complaint refers only generally to its "donors and potential donors." Compl. ¶¶ 159-63.  It does not identify any specific expectancy with which GuideStar has allegedly interfered.

This glaring defect is reason enough to dismiss Count II.  *See, e.g., Mirafuentes v. Estevez*, No. 1:15-cv-10, 2015 WL 8177935, at *5-*6 (E.D. Va. Nov. 30, 2015) (O'Grady, J.) (dismissing interference with expectancy claim where plaintiff alleged expectancies without naming any specific business or individual);  *Brainware, Inc. v. Mahan*, 808 F. Supp. 2d 820, 830 (E.D. Va. 2011) (Brinkema, J.) (dismissing claim where plaintiff alleged that defendant interfered with its relationship with Allstate, a prospective client, "its Complaint alleges no facts establishing any reasonably certain business opportunities with Allstate");  *GTSI Corp. v. Wildflower Int'l,* No. 1:09-cv-123, 2009 WL 2160451, at *8 (E.D. Va. Mar. 9, 2015) (Cacheris, J.) (holding that plaintiff's "attempt to make a blanket allegation about an undefined set of expectancies is insufficient as a matter of law");  *Gov't Employees Ins. Co. v. Google, Inc.*, 330 F. Supp. 2d 700, 705-06 (E.D. Va. 2004) (Brinkema, J.) (dismissing claim where plaintiff's allegations were "too broad and conclusory to plead a specific, existing contract or expectancy with a specific party"); *Masco Contractor Servs.,* 279 F. Supp. 2d at 709-10 (dismissing

interference with expectancy claim because "at most, [plaintiff] alleges that [defendant] has coerced suppliers and consumers generally" but the "general expectancy to remain in business" is insufficient); *Eurotech, Inc. v. Cosmos European Travels Aktiengesellschaft,* 189 F. Supp. 2d 385, 391 (E.D. Va. 2002) (Ellis, J.) ("Because plaintiffs do not identify the specific business relationships with which defendant has interfered, plaintiffs' tortious interference claim fails.").

That is not the only fatal defect in Liberty Counsel's claim.  Liberty Counsel must also allege that GuideStar *knew* about the specific expectancy that was allegedly lost or terminated. Yet, Liberty Counsel alleges only that GuideStar knows that Liberty Counsel receives funds from donors and potential donors because it posts Liberty Counsel's IRS Forms 990 on its website.  Compl. ¶ 164.  But knowing that Liberty Counsel receives revenue from donations is plainly inadequate to allege that GuideStar knew of whatever specific expectancy Liberty Counsel is claiming has been terminated.  *See, e.g., Mirafuentes*, 2015 WL 8177935, at *5 (finding second element of claim was not satisfied where plaintiff alleged that defendant knew she was starting a business because defendant's "alleged knowledge of [plaintiff's] business does not equate to [him] having knowledge of specific, existing contracts held by [plaintiff]").

As the third fatal defect in its claim, Liberty Counsel has failed to allege that GuideStar intentionally interfered with whatever specific expectancy Liberty Counsel is alleging has been lost—the third element of the claim.  Publishing a statement with the knowledge that it could be read by the plaintiff's customers or potential customers is not intentional interference for purposes of such a claim. *See, e.g., Comminelli v. The Rector & Visitors of the Univ. of Va.*, 589 F. Supp. 2d 706, 717 (W.D. Va. 2008) (finding that defendant's publication of email with knowledge that its contents might be shared with university with whom plaintiff was seeking employment was insufficient to state prima facie claim), *aff'd* 362 F. App'x 359 (4th Cir. 2010).

Finally, Liberty Counsel has not alleged that GuideStar used any "improper method" to interfere with its business expectancies.  While Liberty Counsel attempts to fulfill this element by referencing its Lanham Act and defamation claims, as explained in Sections IV.A, and C, *supra*, each of those claims fails as a matter of law.  They cannot, therefore, supply the "improper method" required to state a plausible interference with expectancy claim.

**C.      Liberty Counsel Has Not Alleged A Plausible Defamation Claim, And It Cannot Do So (Count III).**

In order to maintain an action for defamation under Virginia law, the plaintiff must show that the defendant (1) published (2) an actionable statement (3) with the requisite intent. *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092 (4th Cir. 1993) (citing *Gazette, Inc. v. Harris*, 229 Va. 1, 325 S.E.2d 313, *cert. denied*, 472 U.S. 1032 (1985)); *Jordan v. Kollman*, 269 Va. 569, 575, 612 S.E.2d 203, 206 (2005).  Though the claim may arise under state law, "the First Amendment's press and speech clauses greatly restrict the common law where the defendant is a member of the press, the plaintiff is a public figure, or the subject matter of the supposed libel touches on a matter of public concern."  *Chapin*, 993 F.2d at 1091-92.

In *Chapin*, the Fourth Circuit found that "the integrity of charities soliciting funds from the public" was a matter of public concern.  *Id.* at 1092 & n.4.  It also found that, under its precedent involving libel suits by charities, a complaint by a nonprofit and its president had "irretractably admitted on the face of the complaint" their status as public figures because the complaint "extol[led]" the charity's nationwide charitable activities and their long duration and complained that the president had suffered injury to his "'public' reputation as 'an honest fundraiser and charitable leader.'"  *Id.* (citing *National Foundation for Cancer Research, Inc. v. Council of Better Business Bureaus, Inc.*, 705 F.2d 98, 101 (4th Cir.) (a charity that "thrusts itself

into the public eye" through "massive solicitation efforts" is a public figure), *cert. denied*, 464 U.S. 830 (1983)).

Liberty Counsel's Complaint likewise irretractably admits that this touches a matter of public concern and involves a plaintiff who is a public figure. Indeed, paragraph 17 through 25 of its Complaint read much like promotional marketing that extols Liberty Counsel's worldwide notoriety. *See e.g.,* Compl. ¶¶ 17-19 (alleging Liberty Counsel's national and international fame); ¶ 20 (alleging Liberty Counsel's involvement in "countless" media appearances and the "international attention" it has "gained" for its appearance on a CNN documentary); ¶¶ 21-22 (alleging that Liberty Counsel's attorneys have testified "countless" times before state legislatures, administrative agencies, and federal Congressional committees); ¶ 23 (identifying Liberty Counsel's many "affiliated ministries," none of whom are mentioned again in the Complaint); ¶ 25 (describing Liberty Counsel's mission to advocate "throughout the country and around the world"). Moreover, Liberty Counsel's claimed injuries are injuries to its reputation and "financial support" from donors and potential donors. *See, e.g., id.* ¶¶ 181-84.

Liberty Counsel's defamation claim fails as a matter of law because the SPLC Notation is not an actionable statement, and even if it was, Liberty Counsel has not alleged any facts showing that GuideStar published the SPLC Notation with the requisite intent.

1.      **The SPLC Notation Is Not Actionable.**

To be actionable, a statement must assert "a provably false fact or factual connotation." *Chapin*, 993 F.2d at 1093; *Yeagle v. Collegiate Times*, 255 Va. 293, 295, 497 S.E.2d 136, 137 (1998). Stated differently, if the statement is not defamatory, is not false, or is a protected expression of opinion, then it is not actionable. *Jordan*, 269 Va. at 575, 612 S.E.2d at 206; *Am. Commc'ns Network, Inc. v. Williams*, 264 Va. 336, 340-41, 568 S.E.2d 683, 685-86 (2002). Moreover, "the falsity of a statement and the defamatory 'sting' of the publication must

-22-

coincide." *Chapin*, 993 F.2d at 1092.   In other words, a statement is not actionable if the alleged defamatory "sting" arises from "substantially true facts." *Id.*

Whether a statement is actionable is a question of law to be decided by the court. *Chapin*, 993 F.2d at 1092; *Hyland v. Raytheon Tech. Servs.*, 277 Va. 40, 47, 670 S.E.2d 746, 750-51 (2009).  The court must "assess how an objective, reasonable reader would understand a challenged statement by focusing on the plain language of the statement and the context and general tenor of its message." *Snyder v. Phelps*, 580 F.3d 206, 219 (4th Cir. 2009); *Schaecher v. Bouffault*, 290 Va. 83, 93, 772 S.E.2d 589, 595 (2015).  The "verifiability of the statement" should be paid particular attention "because a statement not subject to objective verification is not likely to assert actual facts." *Snyder*, 580 F.3d at 219.

The court also must remain mindful that the First Amendment protects "statements on matters of public concern that fail to contain a 'provably false factual connotation.'" *Id.* at 219-20 (quoting *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 20 (1990)).   It also protects "rhetorical statements employing 'loose, figurative, or hyperbolic language' … to ensure that 'public debate will not suffer for lack of imaginative expression or the rhetorical hyperbole which has traditionally added much to the discourse of our Nation.'" *Id.* at 220 (quoting *Milkovich*, 497 U.S. at 20-21).

Here, the SPLC Notation stated:  "This organization was flagged as a hate group by the Southern Poverty Law Center."  Liberty Counsel alleges that this statement asserts that Liberty Counsel, in fact, *is* a hate group.  That argument fails the objective, reasonable reader standard. *See Mirafuentes*, 2015 WL 8177935, at *3 (article that stated that plaintiff was "one of 10 Mexicans perceived to be among the most corrupt in 2013" could not be read as stating that

plaintiff "is corrupt").   No fair-minded reader would take the SPLC Notation to mean anything other than that, in the SPLC's view, Liberty Counsel is a "hate group."

That factual assertion is true.  As Liberty Counsel repeatedly states, it *was* designated as a hate group by the SPLC.  "The truth may sting, but it is the truth nonetheless, and persons who inject themselves into public activities like charity fundraising must accept the public eye." *Chapin*, 993 F.2d at 1095.  Liberty Counsel's defamation claim, therefore, fails for lack of any actionable statement.

### 2.    Liberty Counsel Has Not Alleged Any Facts Showing Actual Malice.

Even if Liberty Counsel could show that the SPLC Notation is actionable, its defamation claim would still fail as a matter of law because it has not alleged any facts showing that GuideStar published the SPLC Notation with the requisite intent.

Where, as in this case, the plaintiff is a public figure, the First Amendment demands the plaintiff show that the alleged defamatory statement was made with "actual malice"—that is, "with knowledge that it was false or with reckless disregard of whether it was false or not." *N.Y. Times Co. v. Sullivan*, 376 U.S. 254, 279-80 (1964).[11]  The actual malice standard subordinates "a State's interest in preventing and redressing injuries to individuals' reputations in favor of society's interest in uninhibited, robust, and wide-open debate on public issues." *Hatfill v. New York Times Co.*, 532 F.3d 312, 317 (4th Cir. 2008).  It is grounded in the recognition "that public officials and public figures have 'greater access to the channels of effective communication and

---

[11] The actual malice standard applies both to "all-purpose public figures," who achieve such pervasive fame or notoriety that they become public figures for all purposes and in all contexts and to "limited-purpose public figures" who voluntarily inject themselves into a particular public controversy and thereby become public figures for a limited range of issues. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342-43 (1974); *Foretich v. Capital Cities/ABC, Inc.*, 37 F.3d 1541, 1553 (4th Cir. 1994).  As discussed above, Liberty Counsel's Complaint admits its status as a public figure.

hence have a more realistic opportunity to counteract false statements than private individuals normally enjoy.'" *Id.* at 317-18 (quoting *Gertz*, 418 U.S. at 344).

Under the actual malice standard, "it is not enough for a plaintiff to prove simply that the defendant failed to investigate or to check the accuracy of a false statement." *Hatfill*, 532 F.3d at 317 (citing *Gertz*, 418 U.S. at 332). Instead, it requires that "the defendant have a 'subjective awareness of probable falsity' of the publication." *Id.* (quoting *Gertz,* 418 U.S. at 335 n.6). The plaintiff, therefore, must show "the defendant in fact entertained serious doubts as to the truth of his publication" and "that the defendant actually had a high degree of awareness of [their] probable falsity." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 688 (1989) (internal quotation omitted); *Shenandoah Publ'g House, Inc. v. Gunter*, 245 Va. 320, 324, 427 S.E.2d 370, 372 (1993) (adopting the "high degree of awareness" test for reckless disregard for the truth).

Liberty Counsel has not alleged any facts showing that GuideStar acted with actual malice. Nor could it do so, because the SPLC Notation is literally true.

But even under its theory that the SPLC Notation implies that Liberty Counsel is, in fact, a "hate group," Liberty Counsel has made no showing of actual malice. It alleges that GuideStar defines a "hate group" as "an organization that denigrates a group of people based on their identity." Compl. ¶ 43. Liberty Counsel alleges no facts to show that it does not fit this definition, much less that GuideStar had "a high degree of awareness" that Liberty Counsel is not a "hate group" under GuideStar's understanding of the term. Far from showing that GuideStar had a "high awareness" of the "probable falsity" of the SPLC Notation, Liberty Counsel's Complaint itself cites an article which points out the lack of any "significant academic centers that regularly publish objective and rigorous data on non-Islamic domestic extremism" and notes

that journalists who cover domestic extremism "often rely on the SPLC for facts and figures." Exhibit 6, Berger Article (cited at Compl. ¶¶ 77-78). This only confirms that Liberty Counsel *cannot* plead any facts to demonstrate that GuideStar added the SPLC Notation with reckless disregard.

Liberty Counsel's defamation claim, therefore, fails as a matter of law for two independent reasons, neither of which can be cured by an amendment.

## IV. CONCLUSION

For all of these reasons, GuideStar requests the Court dismiss the Complaint with prejudice.

Respectfully submitted,

GUIDESTAR USA, INC.

By:_____/s/_____

Sona Rewari (VSB No. 47327)
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
(703) 714-7512
(703) 918-4018 (facsimile)
srewari@hunton.com

Gregory N. Stillman (VSB No. 14308)
Wendy C. McGraw (VSB No. 37880)
HUNTON & WILLIAMS LLP
500 East Main, Suite 1000
Norfolk, Virginia 23510
(757) 640-5300
(757) 625-7720 (facsimile)
gstillman@hunton.com
wmcgraw@hunton.com

*Counsel for Defendant*

-26-

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that on the 24th day of July, 2017, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will send a notification of such filing (NEF) to all counsel of record.

/s/
_____
Sona Rewari (VSB No. 47327)
HUNTON & WILLIAMS LLP
2200 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
(703) 714-7512
(703) 918-4018 (facsimile)
srewari@hunton.com
